1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANIANO OLEA,                        )        No. C 12-0148 LHK (PR)
                                    )
              Petitioner,           )        ORDER DENYING PETITION FOR
                                    )        WRIT OF HABEAS CORPUS;
   v.                               )        DENYING CERTIFICATE OF
                                    )        APPEALABILITY
WARDEN,                             )
                                    )
              Respondent.           )
_____)

17        Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  On April 10, 2012, the court ordered respondent to show cause

19   why the petition should not be granted.  On December 28, 2012, respondent filed an answer.  On

20   January 8, 2013, respondent filed a supplemental answer.  After receiving several extensions of

21   time, on April 7, 2014, petitioner filed a traverse.  After being directed by the court to file a

22   supplemental brief, and to address the issue of exhaustion, if any, on September 30, 3014,

23   respondent filed a motion to dismiss several claims for failure to exhaust.  On December 10,

24   2014, petitioner filed an opposition thereto.  Respondent did not file a reply.  Having reviewed

25   the submitted pleadings and the underlying record, the court concludes that petitioner is not

26   entitled to relief based on the claims presented, and DENIES the petition on the merits.

27                                    **PROCEDURAL HISTORY**

28        On March 9, 2009, a jury found petitioner guilty of 25 counts, including: torture; corporal

1  injury to a spouse; assault likely to produce great bodily injury; aggravated mayhem; making

2  criminal threats; witness intimidation; stalking; unlawful possession of a firearm by a felon; and

3  unlawful possession of ammunition. (Resp. Memo. P & A at 1.) On June 2, 2009, the trial court

4  sentenced petitioner to a term of 20 years plus 28 years to life in state prison. (*Id.*)

5      On October 29, 2010, the California Court of Appeal affirmed petitioner's conviction and

6  judgment. (Resp. Ex. E.) On January 26, 2011, the California Supreme Court denied

7  petitioner's petition for review. (Resp. Ex. G.) Petitioner then filed unsuccessful state habeas

8  petitions in Superior Court, the Court of Appeal, and the California Supreme Court. (Resp. Exs.

9  H - N.)

10     On January 9, 2012, petitioner filed the underlying federal petition for writ of habeas

11 corpus.

12                                    **BACKGROUND**[1]

13     Defendant and his spouse met in early 1986 when she was pregnant with her
       older daughter, and they married in 1989. They lived in a rural part of
14     Monterey County and had a daughter together in 1993. Defendant was
       abusive toward his spouse from the beginning of their relationship. He
15     constantly questioned her about her conversations with others and about her
       past sexual history, and he constantly hit her with his hands and with items
16     such as a belt, a mallet, or a baseball bat. The physical abuse caused bruising,
       swelling, scratch marks, a concussion, and, at one time, a torn ACL.
17     Defendant also burned the side of his spouse's face with hot barbeque tongs.
       He admitted that he put a GPS device on her car so that he could track her
18     whereabouts. His spouse attempted suicide once by taking an overdose of
       pills in September 2006.
19
       Defendant learned about tattooing as a teenager, and his spouse willingly
20     allowed defendant to put "dozens of tattoos" on her body. However, she
       testified that she told him that she did not want some of the tattoos he gave
21     her. The unwanted tattoos were the subject of the mayhem counts alleged
       against defendant.
22
   (Resp. Ex. E at 3-4.)
23
                                     **DISCUSSION**
24
   A.   Standard of Review
25
        This court may entertain a petition for writ of habeas corpus "in behalf of a person in
26
   custody pursuant to the judgment of a State court only on the ground that he is in custody in
27
   ────────────────────
28
       [1] The following facts are taken from the California Court of Appeal's opinion.

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The

petition may not be granted with respect to any claim that was adjudicated on the merits in state

court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

law or if the state court decides a case differently than [the] Court has on a set of materially

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the

'reasonable application clause,' a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from [the] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly.  Rather, the application must also be unreasonable." *Id.* at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the

state court's application of clearly established federal law was "objectively unreasonable." *Id.* at

409.

B.    Analysis

In the petition, petitioner claims that:  (1) trial counsel rendered ineffective assistance; (2)

appellate counsel rendered ineffective assistance; (3) petitioner was denied a fair trial when the

trial court discharged a "holdout" juror, and the prosecutor committed misconduct; and

(4) petitioner was prejudiced from the cumulative effect of the errors.

1.    Ineffective assistance of trial counsel

Petitioner asserts that counsel had a conflict of interest and was ineffective in several

ways: (1) by failing to apply for bail; (2) by failing to investigate petitioner's mental status; (3)

1    by failing to move to suppress seized evidence; (4) by committing fraud upon the Superior

2    Court; and (5) by moving to withdraw as counsel and allowing an inexperienced junior associate

3    to take over the case.[2]

4          In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

5    must establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

6    that it fell below an "objective standard of reasonableness" under prevailing professional norms.

7    *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was

8    prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that,

9    but for counsel's unprofessional errors, the result of the proceeding would have been different."

10   *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the

11   outcome.  *Id.*

12         Petitioner argues, however, that the court should not evaluate his claim under *Strickland*,

13   but rather, under *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980).  Specifically, petitioner claims

14   that counsel, who was retained, harbored an active conflict of interest between representing

15   petitioner and maximizing counsel's own financial interest.

16         The Sixth Amendment's right to conflict-free counsel is violated only if the conflict

17   "adversely affected" trial counsel's performance.  *Alberni v. McDaniel*, 458 F.3d 860, 870 (9th

18   Cir. 2006).  "[A]n actual conflict of interest mean[s] precisely a conflict that affected counsel's

19   performance – as opposed to a mere theoretical division of loyalties."  *Mickens v. Taylor*, 535

20   U.S. 162, 171 (2002) (emphasis omitted).  A conflict of interest can arise when counsel

21   represents multiple defendants whose interests are hostile to one another.  In order to establish a

22   violation of the Sixth Amendment, a petitioner must demonstrate that: (1) counsel actively

23   represented conflicting interests, and (2) an actual conflict of interest adversely affected

24

25         [2] Petitioner's statements regarding counsel's role in petitioner's divorce action as well as
     counsel's actions in withholding defense funds do not appear to be habeas claims.  Rather, they
26   appear to support petitioner's argument that counsel had a conflict of interest.  A review of
     petitioner's state habeas petition to the California Supreme Court supports this assessment as
27   petitioner did not specifically raise allegations regarding counsel's role in petitioner's divorce, or
     counsel's actions in withholding defense funds as distinct claims in the state court.  (Resp. Ex.
28   M.)

1  counsel's performance.  *Sullivan*, 446 U.S. at 348-50.

2       Fatal to petitioner's argument here, is the fact that the Supreme Court has not extended

3  Sixth Amendment conflict of interest jurisprudence beyond conflicts involving multiple

4  concurrent representation.  *Mickens*, 535 U.S. at 162, 174-76.  Indeed, the Supreme Court has

5  held that conflicts other than multiple representation, such as conflicts based on financial issues,

6  are not constitutionally based.  *Id.* at 174-75; *see, e.g.*, *Foote v. Del Papa*, 492 F.3d 1026, 1029

7  (9th Cir. 2007) (affirming district court's denial of petitioner's habeas claim alleging a violation

8  of his right to conflict-free appointed appellate counsel because no Supreme Court case has held

9  an irreconcilable conflict between the defendant and his appointed appellate counsel violates the

10  Sixth Amendment, nor has the Supreme Court held that a defendant states a Sixth Amendment

11  claim by alleging that appointed appellate counsel had a conflict of interest due to the

12  defendant's dismissed lawsuit against the public defender's office and appointed pre-trial

13  counsel); *Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) (rejecting conflicts claim when

14  defense counsel and client had an intimate relationship, and stating, "While our circuit's

15  precedent has expanded the scope of the *Sullivan* exception to apply in other contexts, and while

16  we strongly disapprove of [counsel's] unprofessional behavior as reflected in her conduct at bar,

17  the advent of AEDPA forecloses the option of reversing a state court determination simply

18  because it conflicts with established circuit law.").  Thus, petitioner's allegation that counsel's

19  financial interest competed with counsel's representation of petitioner does not present an

20  "actual conflict."  *See, e.g.*, *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995) (finding no

21  actual conflict when inmate alleged that any payment for additional investigation would have

22  come from counsel's personal pocket); *Arenas v. Adams*, No. CV 08-7084-AHM (RCF), 2011

23  WL 7164453, at *12-13 (C.D. Cal. filed Nov. 30, 2011) (unpublished) (finding no actual conflict

24  when inmate alleged that counsel was interested in concluding the case as quickly as possible

25  due to the fact that a flat fee was paid by inmate's mother to represent him).

26       Accordingly, petitioner's argument that the court should evaluate his claim of ineffective

27  assistance under the *Sullivan* standard is not well-taken.

28

1

        A.     Failure to apply for bail[3]

2

Petitioner argues that counsel failed to move to have petitioner released on bail.

3 Petitioner states that, had he been released on bail, he could have assisted counsel more easily in

4 preparing for his defense.  Petitioner's claim that counsel was ineffective for not requesting bail

5 fails because petitioner has not shown a reasonable probability that his pretrial release on bail

6 would have altered the result of trial.  *See Percival v. Marshall*, No. 93-20068 RPA, 1996 WL

7 107279, at *2 (N.D. Cal. March 7, 1996) ("Not being free on bail pending trial does not affect

8 final disposition."), *aff'd by* No. 96-15724, 106 F.3d 408 (9th Cir. 1997) (unpublished

9 memorandum disposition).

10

Apparently, bail was initially set at $2,000,000.  (Traverse at 6.)  To the extent petitioner

11 argues that counsel should have argued that bail was excessive, that claim is not properly before

12 this court because petitioner raises it for the first time in his traverse.  A traverse is not the proper

13 pleading to raise additional grounds for relief.  In order for the respondent to be properly advised

14 of additional claims, they should be presented in an amended petition or in a statement of

15 additional grounds.  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  Only then

16 can the respondent answer the claims and the action can proceed.  *Id.*

17

Nonetheless, even assuming this claim is properly before the court, it is without merit

18 because petitioner fails to show prejudice.  "Excessive bail shall not be required, nor excessive

19 fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The Bail

20 Clause requires that, when bail is set, it cannot be excessive.  *See Carlson v. Landon*, 342 U.S.

21 524, 545 (1952).  However, the Bail Clause does not require that bail be available in all cases.

22 *See United States v. Salerno*, 481 U.S. 739, 752-54 (1987).  "Neither the Supreme Court nor [the

23

---

24      [3]  Respondent moves to dismiss this claim as unexhausted.  A federal court may deny an
25 unexhausted claim or petition on the merits when it is clear that the applicant does not raise a
colorable federal claim.  *See Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).  Here,
26 because the court has determined that petitioner's claim is not a colorable federal claim, the court
need not reach the issue of exhaustion.  Rather, the court exercises its discretion and denies the
27 claim on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus
may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies
28 available in the courts of the State").

1  Ninth Circuit has] held that the Clause is incorporated against the States." *Galen v. County of*

2  *Los Angeles*, 477 F.3d 652, 659 (9th Cir. 2007) (assuming without deciding that the excessive

3  bail clause of the Eighth Amendment applies to the states in a Section 1983 case).  In order to

4  succeed on a motion that bail was excessive, petitioner would have had to show that bail was set

5  for purposes not authorized by California law, or that the amount of bail was excessive in light of

6  the valid purposes for which it was set. *Id.* at 660-61.  In addition, prior to setting bail,

7  California law requires the trial court to take into consideration factors such as:  the protection of

8  the public, the seriousness of the offense charged, the previous criminal record of the defendant,

9  and the probability of his or her appearing at trial or at a hearing of the case." Cal. Penal Code §

10  1275(a)(1).  When considering the seriousness of the offense charged, the trial court must

11  consider the alleged injuries and threats made to the victim. *Id.* § 1275(a)(2).

12  Here, there were ample claims of the alleged injuries and threats to the victim ("Jane

13  Doe").  Petitioner's statements that he had strong ties with the community and never failed to

14  appear in court do not acknowledge that the trial court was also required to consider the

15  seriousness of the offenses when determining the amount of bail.  Moreover, the setting of bail is

16  a discretionary matter for the trial court.  In short, petitioner provides no evidence or argument

17  that the purpose for setting bail was unauthorized, or that the amount of bail was excessive in

18  light of such purpose.  Thus, petitioner has failed to show that he was prejudiced by counsel's

19  decision not to argue that the bail was excessive.

20  Accordingly, this claim is without merit.

21  **B.**   <u>Failure to investigate mental status</u>

22  Petitioner argues that counsel should have investigated the possibility of a mental defense

23  or pursued a plea of not guilty by reason of insanity or diminished capacity.

24  The Superior Court rejected this claim as follows:

25  Finally, Petitioner alleges that his trial counsel was ineffective because he
failed to investigate the defense of not guilty by reason of insanity.  Again,

26  Petitioner does not provide any evidence indicating that his attorney was
aware of facts, or should have been aware of facts, to render such a viable

27  defense.  Petitioner attached documents showing that he qualified for mental
health services while incarcerated; however, the dates of these services

28  occurred after Petitioner had already been convicted and sentenced to four

1    life terms.  Inmates commonly require mental health services for a variety of
     reasons.  Furthermore, a defendant may, upon a showing of good cause,
2    change his not guilty plea to a plea of not guilty by reason of insanity even
     after his trial has begun.  (*People v. Lutman* (1980) 104 Cal. App. 3d 64.)
3    The fact that Petitioner's trial counsel did not raise this defense does not in
     itself demonstrate a deficient or prejudicial performance.  A conviction will
4    be set aside only "when the record demonstrates there could have been no
     rational tactical purpose for counsel's challenged act or omission."  (*People*
5    *v. Mesa* (2006) 144 Cal. App. 4th 1000, 1007.)

6    (Resp. Ex. J at 3-4.)

7        Petitioner's claim that counsel should have investigated a diminished capacity defense is

8    unpersuasive.  The defense of diminished capacity was abolished in California in 1982.  *Daniels*

9    *v. Woodford*, 428 F.3d 1181, 1208 n.29 (9th Cir. 2005).  Because petitioner did not begin a

10   relationship with Jane Doe until 1986, none of the charged offenses occurred until after the

11   diminished capacity defense was already unavailable.  Therefore, a diminished capacity defense

12   was unavailable to petitioner.  *See Sully v. Ayers*, 725 F.3d 1057, 1070 (9th Cir. 2013)

13   (recognizing that because the charged offenses occurred after 1982, no diminished capacity

14   defense was available).

15       Moreover, petitioner has not provided any evidence to demonstrate that counsel had

16   notice of any facts sufficient to give rise to a duty to investigate the possibility of a mental defect

17   defense.  In addition, even if the court were to find that petitioner has shown deficient

18   performance on the part of his trial attorney, petitioner must also establish prejudice resulting

19   from that deficient performance.  This he has not done.  Petitioner merely asserts that, because of

20   the crimes charged against him, counsel should have questioned petitioner's mental state.

21   However, petitioner has not identified anything in the record that explains the nature or extent of

22   any mental disease, defect, or disorder from which he could have suffered at the time of his

23   offense.  Although petitioner attached copies of several of his mental health records, those

24   records are from 2009 and 2010 (Pet., Ex. 19), after petitioner had already been convicted of the

25   underlying offenses in 2009.  Moreover, the records merely show that petitioner received mental

26   health evaluations in 2009 and 2010, and suffered from depression.  Thus, the records are not

27   persuasive in demonstrating that petitioner suffered from any mental disease or defect from the

28   time petitioner began his relationship with Jane Doe in 1986 up to the date of the last charged

offense in 2007.  Petitioner has not shown that any mental disorder may have affected him at the time of the offense in such a way that he did not and could not form the specific intent required for his convictions.  He has not demonstrated through the record that, had counsel investigated petitioner's mental condition, counsel would have obtained evidence tending to show that petitioner was afflicted by a mental disorder that affected him at the time of the offense in such a way that he did not form the specific intent required to commit the charged offenses.  Consequently, petitioner has not shown there was a reasonable probability that, but for counsel's failure to investigate the possibility of a mental defect defense, the result of the trial would have been different.[4]  *See Gonzalez v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008) (rejecting petitioner's ineffective assistance claim for failing to investigate a mental illness defense when petitioner did not allege that he actually suffered from any mental illness because speculation is insufficient to establish prejudice).  Accordingly, petitioner has not established that he was denied the effective assistance of counsel in this claim.

C.      Failure to file motion to suppress[5]

Petitioner claims that counsel failed to file a motion to suppress after approximately ten searches and seizures occurred with and without warrants.  Respondent argues that each of the exhibits admitted into evidence at trial were obtained through a search warrant or through the consent of Jane Doe, who was petitioner's spouse and the victim.

In order to establish ineffective assistance of counsel based on defense counsel's failure

---

[4]  Petitioner raises for the first time in his traverse that counsel should have obtained a psychiatric expert, to show that the victim and petitioner engaged in extreme sexual deviant behavior.  (Traverse at 9-10.)  Petitioner asserts that a psychiatric evaluation could have informed counsel whether a mental defect defense would have been viable.  Notwithstanding the impropriety of raising this argument in the traverse, *see Cacoperdo*, 37 F.3d at 507, petitioner offers no explanation as to how he was prejudiced by counsel's failure to pursue a psychiatric evaluation.

[5]  Respondent moves to dismiss this claim as unexhausted.  A federal court may deny an unexhausted claim or petition on the merits when it is clear that the applicant does not raise a colorable federal claim.  *See Cassett*, 406 F.3d at 623-24.  Here, because the court has determined that petitioner's claim is not a colorable federal claim, the court need not reach the issue of exhaustion.  Rather, the court exercises its discretion and denies the claim on the merits.  *See* 28 U.S.C. § 2254(b)(2).

1    to litigate a Fourth Amendment issue, petitioner must show that: (1) the overlooked motion to

2    suppress would have been meritorious, and (2) there is a reasonable probability that the jury

3    would have reached a different verdict absent the introduction of the unlawful evidence. *Ortiz-*

4    *Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003).

5            Here, petitioner does not specify what seized evidence should have been suppressed and

6    why such a motion would have been meritorious.  Petitioner appears to argue merely that

7    counsel should have filed at least one suppression motion based on the amount of money that

8    counsel was charging for his services.  For this reason alone, petitioner's claim is unpersuasive.

9            Moreover, petitioner raises for the first time in his traverse that counsel "required

10   petitioner to waive his Fourth Amendment rights specifically in regards to two safe's [sic]

11   confiscated by the police pursuant to separate search warrants . . ." (Traverse at 8.)  Petitioner

12   then states that the safes were not under his sole or direct control, but that Jane Doe directed

13   police to one of the safes, and gave the police the combination to that safe.  (*Id.*)

14   Notwithstanding the impropriety of raising these arguments for the first time in the traverse, *see*

15   *Cacoperdo*, 37 F.3d at 507, they lack merit.

16           Petitioner fails to proffer that a suppression motion would have been successful.

17   Petitioner does not set forth evidence suggesting that the search warrants were invalid.

18   Petitioner concedes that he "waive[d] his Fourth Amendment rights specifically in regards to two

19   safe's [sic] confiscated by the police pursuant to separate search warrants . . ." (Traverse at 8.)

20   Even if petitioner's waiver is invalid, Jane Doe's actual or apparent authority to consent to

21   search of a common property, such as a safe, appears to waive Fourth Amendment protection as

22   to at least one of the two safes.  *See United States v. Davis*, 332 F.3d 1163, 1168-69 (9th Cir.

23   2003) (recognizing that a third party has actual authority to consent to a search of someone else's

24   property if the third party had mutual use of and joint access to or control over the property);

25   *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000) (affirming the apparent three-part

26   analysis necessary to find apparent authority: (1) was the officer's belief in consent based in part

27   on an untrue fact, (2) was it reasonable to believe the fact was true, and (3) if the fact were true,

28   would the consent-giver have had actual authority.).

1    Accordingly, petitioner has not established that he was denied the effective assistance of

2    counsel in this claim.

3          D.      Committing fraud upon the Superior Court[6]

4    Petitioner claims that counsel committed fraud upon the trial court by instructing his

5    employees to prepare pleadings and list petitioner as proceeding *pro se*.  In petitioner's traverse,

6    petitioner also argues that trial counsel lied to the court concerning petitioner's financial status in

7    order to convince the court to permit counsel to withdraw from representation.  (Traverse at 12.)

8          Petitioner's traverse appears to clarify that petitioner does not raise this allegation as one

9    of ineffective assistance, but rather as support for petitioner's assertion that counsel harbored a

10   conflict of interest between counsel's representation of petitioner and counsel's own financial

11   interest.  The court has already determined that there is no clearly established Supreme Court

12   case concluding that such competing interests amount to a conflict of interest under *Cuyler v.*

13   *Sullivan*, 446 U.S. 335 (1980).  Thus, because petitioner failed to demonstrate that counsel

14   actively represented conflicting interests, the *Sullivan* analysis, which requires a showing that an

15   actual conflict adversely affected counsel's performance rather than a showing of actual

16   prejudice, is inapplicable here.  *See id.* at 349-50.  However, even analyzing this claim under a

17   *Strickland* framework, again, petitioner fails to demonstrate how these actions prejudiced

18   petitioner's case.  That is, petitioner does not demonstrate that "there is a reasonable probability

19   that, but for counsel's unprofessional errors, the result of the proceeding would have been

20   different."  *Strickland*, 466 U.S. at 694.

21         Thus, petitioner is not entitled to habeas relief on this claim.

22         E.      Request to withdraw as counsel and replacement by junior associate

23   Petitioner claims that counsel was ineffective when he moved to withdraw as counsel on

24

25         [6] Respondent moves to dismiss this claim as unexhausted.  A federal court may deny an
26   unexhausted claim or petition on the merits when it is clear that the applicant does not raise a
     colorable federal claim.  *See Cassett*, 406 F.3d at 623-24.  Here, because the court has
27   determined that petitioner's claim is not a colorable federal claim, the court need not reach the
     issue of exhaustion.  Rather, the court exercises its discretion and denies the claim on the merits.
28   *See* 28 U.S.C. § 2254(b)(2).

1    the basis of insufficient funds.  According to petitioner, once the trial court denied counsel's

2    motion, counsel sent his junior associate, Andrew Liu, a newly admitted attorney, to represent

3    petitioner at trial.  Petitioner alleges that Liu failed to move for a mistrial, failed to issue

4    subpoenas for defense witnesses, failed to file a statement to support mitigation, failed to request

5    CALJIC No. 2.21.2, and failed to file a motion for new trial.

6        The Superior Court rejected this claim as follows:

7            Petitioner has failed to demonstrate that his trial counsel's
        performance was either deficient or prejudicial.  Even if counsel failed to file
8        a motion for a new trial or other additional motions after the court denied
        permission to withdraw as attorney of record, Petitioner has failed to
9        demonstrate that a new trial motion or any other motion would have been
        meritorious.

10   (Resp. Ex. J at 3.)

11       The court is reminded that the general rule of *Strickland*, i.e., to review a defense

12   counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably

13   applying *Strickland*, which in turn "translates to a narrower range of decisions that are

14   objectively unreasonable under AEDPA."  *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir.

15   2010) (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, as it

16   does here, "the question is not whether counsel's actions were reasonable.  The question is

17   whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential

18   standard."  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).  In addition, "[d]eference to a state

19   court's conclusion that any deficiency did not result in prejudice requires us to ask whether such

20   a determination by the state court "would be unreasonable."  *Gulbrandson v. Ryan*, 738 F.3d

21   976, 988 (9th Cir. 2013) (quoting *Premo v. Moore*, 131 S.Ct. 733, 744 (2011)).

22       With that standard in mind, the court addresses petitioner's remaining ineffective

23   assistance of trial counsel claims.

24   ///

25   ///

26

27

28

1

a.    Request to withdraw[7]

2     Petitioner claims that counsel Worthington sent his junior associate, Andrew G. Liu, into

3  court to represent petitioner after petitioner's assets were "gone," and attempted to have the

4  Worthington Law Firm removed as defense counsel.  However, in support of his claim,

5  petitioner cites to a portion of the Reporter's Transcript from December 1, 2008, where the

6  parties are arguing a *Brady* violation.  In fact, the record shows that counsel Liu's argument was

7  successful and ultimately, the court agreed that the prosecution violated *Brady*.  (Resp. Ex. B,

8  RT 1310-12.)  Nowhere in this portion of the transcript is there a recitation or any showing that

9  counsel attempted to withdraw the firm from representation.

10    Petitioner's vague arguments about counsel Worthington abandoning petitioner to be

11 represented by a junior associate, counsel Liu, are also unsupported.  The record shows that

12 counsel Liu represented petitioner and conducted petitioner's preliminary hearing examination

13 on December 14, 2007.  (Resp. Ex. A, CT 73.)  Thereafter, at petitioner's scheduled arraignment

14 on January 10, 2008, counsel Liu specially appeared on behalf of petitioner, indicating that the

15 Worthington Law Firm was no longer retained by petitioner, and requesting a continuance on

16 petitioner's behalf.  (Resp. Ex. A, CT 23.)  The trial court granted the continuance and re-set

17 petitioner's arraignment until petitioner could obtain representation.  (*Id.*)  On June 4, 2008,

18 petitioner's arraignment was continued again so that petitioner could attempt to obtain funding in

19 order to hire the Worthington Law Firm to represent him for the criminal proceedings.  (Resp.

20 Ex. B, RT 26-28.)  Finally, the Worthington Law Firm entered a general appearance on

21 petitioner's behalf on September 10, 2008.  (Resp. Ex. B, RT 1271, 1280.)

22    In sum, the record does not support petitioner's allegation that counsel attempted to

23 withdraw from representation, much less that counsel rendered deficient performance by doing

24

25    [7]   Respondent moves to dismiss this claim as unexhausted.  A federal court may deny an
26 unexhausted claim or petition on the merits when it is clear that the applicant does not raise a
colorable federal claim.  *See Cassett*, 406 F.3d at 623-24.  Here, because the court has
27 determined that petitioner's claim is not a colorable federal claim, the court need not reach the
issue of exhaustion.  Rather, the court exercises its discretion and denies the claim on the merits.
28 *See* 28 U.S.C. § 2254(b)(2).

1    so, or that petitioner was prejudiced.

2                          b.    Failure to move for mistrial

3           Petitioner alleges that during trial, a juror sent the trial judge a note asking if petitioner

4    was in custody.  Petitioner states that this note indicated that the juror was afraid and must have

5    reached a conclusion that petitioner was guilty before deliberations even begun.  Thus, argues

6    petitioner, counsel should have moved for a mistrial.

7           Although petitioner has not provided any citation to the record nor any other detail

8    regarding this juror's note, the court searched the record and located a note that was brought to

9    the court's attention during deliberations.  (Resp. Ex. B, Vol. 22 RT 6304.)  The note asked for

10   confirmation that petitioner was currently in jail, and requested clarification of the laws

11   regarding a juror's contact with an inmate.  (*Id.*)  The court responded:

12              As I told you – and I'll deal with this now.  As I told you at the outset of
             trial, there are some matters that are not within the purview of the jury.  And the
13              question of the [petitioner]'s custody status is one of them.  It's not something
             that's relevant to the questions that we ask you to decide.  So, it's not been gone
14              into and cannot be gone into at this point.
                And with respect to the second part of that, I'm not sure I understand, it
15              says clarification of the Penal Code and laws concerning any contact or
             connection with an inmate while serving as a juror.
16              If you're talking about any other inmate other than the one that we're
             dealing with or might be dealing with in this trial, based upon an assumption of
17              the jury, you have the same rights to contact an inmate that anybody else does.
                Obviously, there should be no contact with [petitioner] by a juror, and if
18              the question means questions regarding contact of a defendant trying to contact
             a member of the jury, that, of course, would be totally improper and would not
19              be permitted, and the Court would take immediate action if any such contact
             were attempted.
20
21   *Id.* RT 3604-05.)

22          Petitioner fails to proffer any reason why counsel's failure to move for a mistrial

23   rendered his performance so deficient that counsel's representation fell below an objective

24   standard of reasonableness.  *See Strickland*, 466 U.S. at 688.  Judicial scrutiny of counsel's

25   performance must be highly deferential, and a court must indulge a strong presumption that

26   counsel's conduct falls within the wide range of reasonable professional assistance.  *See id.* at

27   689.  Petitioner has not provided anything to refute or rebut this presumption.

28          Moreover, in order to establish prejudice from failure to file a motion, petitioner must

1  show that (1) had his counsel filed the motion, it is reasonable that the trial court would have

2  granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would

3  have been an outcome more favorable to him.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir.

4  1999).  In California, "[a] mistrial should be granted if the court is apprised of prejudice that it

5  judges incurable by admonition or instruction.  Whether a particular incident is incurably

6  prejudicial is by its nature a speculative matter, and the trial court is vested with considerable

7  discretion in ruling on mistrial motions."  *People v. Wallace*, 44 Cal.4th 1032, 1068 (2008).

8  Here, there is no indication that the court would have granted a motion for mistrial even if

9  counsel raised it.  The record contains no suggestion that any juror was afraid of petitioner, or

10  that any juror deliberated and determined a verdict prior to the close of evidence.  Finally, even

11  if the note were deemed prejudicial, it appears that such prejudice was cured when the court

12  admonished the jury that petitioner's custody was irrelevant to their roles as jurors.

13      Petitioner also claims that counsel should have filed a motion for a mistrial when counsel

14  was informed that during deliberations, Jane Doe was seen with a prosecution witness and that

15  Jane Doe and the prosecution witness were speaking with a juror during a break.  (Resp. Ex. B,

16  RT 6921-23.)  The prosecution's investigator, Investigator Norum, affirmed to the court that he

17  was with Jane Doe and this witness at that time, and that Jane Doe and the witness were out of

18  his line of sight for less than one minute.  (*Id.* at 6922.)  Investigator Norum could see the entire

19  area in which petitioner alleges petitioner saw Jane Doe and this witness speaking with a juror,

20  and Investigator Norum did not see any jurors around.  (*Id.* at 6922.)  The trial court asked

21  Investigator Norum to follow up with Jane Doe and the witness to determine whether either of

22  them recalled speaking with a juror and to let the parties know if there was any follow-up that

23  needed to happen.  (*Id.* at 6922-23.)  No other evidence regarding this interaction has been

24  submitted.[8]  Thus, petitioner's argument falls short of the requirement that petitioner demonstrate

25

26      [8] Petitioner argues that an email from counsel states, "Eleanor (complaining witness) was
   up there raiding there with her battered women's coach when Sheriff came made up a story

27  about why they were there . . ."  Petitioner's exhibit #35, to which he cites in support of this
   allegation, is labeled "Worthington emails of 5/13/08."  (Pet., Ex. 35.)  Exhibit #35 appears to be

28  a copy of typed shorthand notes, purportedly authored by counsel.  Nothing suggests that the

1   that counsel's failure to file a motion for a mistrial based on these facts fell below an objective

2   standard of reasonableness, or that petitioner was prejudiced from the failure.

3                c.      Failure to issue subpoenas for defense witnesses

4        Petitioner claims that counsel failed to issue any subpoenas for defense witnesses.

5   However, the record shows that defense counsel called witnesses to testify at trial, including

6   petitioner. Moreover, to establish prejudice caused by the failure to call a witness, a petitioner

7   must show that the witness was likely to have been available to testify, that the witness would

8   have given the proffered testimony, and that the witnesses' testimony created a reasonable

9   probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v.*

10   *Woodford*, 334 F.3d 862, 889-90 (9th Cir. 2003). Petitioner does not suggest who defense

11   counsel should have subpoenaed, or how petitioner was prejudiced from counsel's failure to do

12   so. Thus, this claim is too conclusory to warrant relief. *See James v. Borg*, 24 F.3d 20, 26 (9th

13   Cir. 1994) ("[c]onclusory allegations which are not supported by a statement of specific facts do

14   not warrant habeas relief").

15                d.      Failure to file statement of mitigation

16        Petitioner claims that counsel failed to prepare or file a statement in mitigation under the

17   California Rules of Court. However, in *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006),

18   the Ninth Circuit recognized that there is no clearly established Supreme Court law establishing

19   that the *Strickland* standard applies to a claim of ineffective assistance of counsel in a noncapital

20   sentencing. Without such precedent, petitioner cannot obtain relief.

21        Moreover, petitioner does not set forth any mitigating factors that counsel did not argue.

22   That is, petitioner did not "identify the acts or omissions of counsel that are alleged not to have

23   been the result of reasonable professional judgment" sufficient to overcome the strong

24   presumption that counsel rendered adequate assistance in the exercise of reasonable professional

25   judgment. *Strickland*, 466 U.S. at 688-89. Petitioner does not explain how any additional

26   argument would have influenced the trial court in such a way that his sentence would have been

27

28   quoted statement refers to the incident being challenged, nor does the exhibit provide any other
     indication as to the context of that statement.

1    reduced. *See James*, 24 F.3d at 26. Thus, petitioner is not entitled to habeas relief on this claim.

2                        e.    Failure to request CALJIC No. 2.21.2

3        Petitioner alleges counsel was ineffective for failing to request CALJIC No. 2.21.2,

4    which states, "A witness who is willfully false in one material part of his or her testimony is to

5    be distrusted. You may reject the entire testimony of a witness whom you have found to have

6    testified falsely as to any material part of his or her testimony." Petitioner asserts that the jury

7    should have been instructed with this because Jane Doe admitted in her testimony that she lied to

8    the police when she claimed that petitioner cut her finger off, when in fact, Jane Doe cut her own

9    finger off.[9] As an initial matter, Jane Doe's testimony spans approximately 650 transcripted

10   pages. The court cannot find, and petitioner does not cite to, the portions of the transcript that

11   demonstrate Jane Doe's alleged admission of this false testimony.

12       Nonetheless, even assuming that Jane Doe admitted lying to the police, the record

13   demonstrates that counsel did request, and the jury was instructed with, CALCRIM No. 226,

14   which recites in detail numerous factors to consider in evaluating the credibility of a witness.[10]

15

16   _____

17       [9] Jane Doe testified that on Mother's Day in 2007, after learning that Jane Doe had an affair with another man in the past, petitioner decided that Jane Doe would have to "give"

18   petitioner five things in exchange for the things Jane Doe had given to her previous lover that had "belonged" to petitioner. (Resp. Ex. B, RT 3185.) First, petitioner hit Jane Doe on the top

19   of her bare foot with a rubber mallet. (*Id.* at 3190-91.) Second, petitioner heated metal tongs and used them to burn Jane Doe's face. (*Id.* at 3195-98.) Thereafter, petitioner continued to

20   remind Jane Doe that she still owed him three more things. (*Id.* at 3200.) Specifically, petitioner decided that Jane Doe would have her eardrum popped, an eye taken out, and a finger removed.

21   (*Id.*) After petitioner continued to remind Jane Doe of these impending events, Jane Doe walked into the kitchen, picked up a cleaver knife, and cut off her own finger. (*Id.* at 3202.) At trial,

22   Jane Doe stated that she did so because she could not deal with listening to petitioner talk about the "five things" any longer. (*Id.*, RT 3380.) However, Jane Doe admitted that it was possible

23   that when she was interviewed by the police in July 2007, Jane Doe had stated that she cut off

24   her own finger because it was her only way of getting help. (*Id.*)

25       [10] For example, CALCRIM No. 226 permits the jury to consider the witness' behavior

26   while testifying; whether the witness' testimony was influenced by bias or prejudice; what the witness' attitude was about the case or about testifying; whether the witness made a past

27   consistent or inconsistent statement; whether other evidence proved or disproved the witness' testimony; whether the witness admitted to being truthful; and whether the witness had engaged

28   in other conduct that reflected upon his or her believability. (Resp. Ex. A, CT 1079-80.)

1   (Resp. Ex. A, CT 1079-80.)  Moreover, CALCRIM No. 226 plainly states, "If you decide that a

2   witness deliberately lied about something significant in this case, you should consider not

3   believing anything that witness says.  Or, if you think the witness lied about some things, but

4   told the truth about others, you may simply accept the part that you think is true and ignore the

5   rest."  (*Id.* at 1080.)  Counsel also requested, and the jury was instructed with, CALCRIM No.

6   318, which informs the jury that if it decides that a witness made prior statements, it may use

7   those statements to evaluate whether the witness' testimony in court is believable and to

8   determine whether the earlier statements are true.  (*Id.* at 1087.)

9         Petitioner fails to demonstrate how the failure to request CALJIC No. 2.21.2 prejudiced

10   him in light of the other instructions adequately covering credibility.  *Cf. George v. Haviland*,

11   No. 10-16873, 506 Fed. Appx. 583, **1 (9th Cir. Jan. 28, 2013) (unpublished memorandum

12   disposition) (finding that any error in instructing the jury with CALCRIM No. 226 rather than

13   CALJIC No. 2.21.2 was harmless because the "substance of CALJIC 2.21.2 was adequately

14   covered by other instructions, including CALCRIM 226, which provides, in part: "You may

15   believe all, part, or none of any witness's testimony. . . .  In evaluating a witness's testimony, you

16   may consider anything that reasonably tends to prove or disprove the truth or accuracy of that

17   testimony.").

18                    F.    Failure to file motion for new trial

19         Petitioner's petition alleges that counsel failed to file a motion for a new trial setting forth

20   trial errors, and as such, waived petitioner's right to raise these matters on direct appeal.

21   However, the petition does not set forth what issues trial counsel should have argued in a motion

22   for new trial.  Thus, this claim as set forth in the petition is too conclusory to warrant relief.  *See*

23   *James*, 24 F.3d at 26.

24         In his traverse, petitioner raises for the first time that counsel should have moved for a

25   new trial when the court dismissed Juror Number 10 after almost one week of deliberations.

26   However, the record shows that counsel objected to the juror's removal, and moved for mistrial,

27   which was denied.  Moreover, appellate counsel raised the claim of improper removal of Juror

28   Number 10 on direct appeal.  Thus, petitioner cannot demonstrate prejudice from counsel's

1  failure to otherwise move for a new trial.  Also for the first time in the traverse, petitioner briefly

2  suggests arguments that counsel could have raised in a motion for a new trial.  (Traverse at 11.)

3  However, petitioner does not support these arguments with any facts, the argument is improperly

4  raised for the first time in the traverse, *see Cacoperdo*, 37 F.3d at 507, and the claim is too

5  conclusory to warrant relief, *see James*, 24 F.3d at 26.  Moreover, petitioner cannot demonstrate

6  prejudice.

7         2.      Ineffective assistance of appellate counsel

8         Petitioner alleges that appellate counsel was ineffective for failing to raise a variety of

9  issues.  Specifically, petitioner argues that appellate counsel should have raised: (1)  the

10  ineffective assistance claims listed above; (2) a *Brady* violation; (3) use of the word "victim;" (4)

11  the issue of Jane Doe and a prosecution witness contacting a juror during deliberations; (5)

12  introduction of petitioner's prior bad acts; and (6) a "chain of evidence" issue.

13         Claims of ineffective assistance of appellate counsel are reviewed according to the

14  standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528 U.S.

15  259, 285 (2000).  It is important to note that appellate counsel does not have a constitutional duty

16  to raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745,

17  751-54 (1983).

18         a.      Failure to raise ineffective assistance of trial counsel

19         To the extent petitioner argues that appellate counsel should have raised the ineffective

20  assistance of counsel claims above, this claim fails.  To determine whether appellate counsel's

21  failure to raise a claim of ineffective assistance of trial counsel was objectively unreasonable and

22  prejudicial, the district court must first assess the merits of the underlying claim that trial counsel

23  provided constitutionally deficient performance.  *Moormann v. Ryan*, 628 F.3d 1102, 1106-07

24  (9th Cir. 2010).  If trial counsel's performance was not objectively unreasonable or did not

25  prejudice the petitioner, then appellate counsel did not act unreasonably in failing to raise a

26  meritless claim of ineffective assistance of counsel, and the petitioner was not prejudiced by

27  appellate counsel's omission.  *Id.*  Because the court has addressed petitioner's ineffective

28  assistance of counsel claims and found them to be without merit, petitioner's ineffective

1   assistance of appellate counsel claims for failing to raise these claims fail.

2        Moreover, petitioner provides the court with appellate counsel's detailed handwritten

3   notes in which appellate counsel poured over the trial court record to locate arguable issues for

4   appeal. (Pet. Exs., 50-53.)  In addition, appellate counsel communicated with petitioner and

5   explained why he rejected some of the issues petitioner wished to raise.  Specifically, appellate

6   counsel rejected petitioner's claims of ineffective assistance of trial counsel, informing petitioner

7   that appellate counsel did not believe there were instances of prejudicial ineffective assistance of

8   trial counsel.  (*Id.*, Exs. 12, 17.)

9        Here, appellate counsel was clearly aware of petitioner's ineffective assistance of counsel

10  claims.  Appellate counsel's decision to abandon these claims and instead present other claims

11  on direct appeal must have been informed and based on tactical reasons.  "[S]trategic choice[s]"

12  made after a "thorough investigation of law and facts" are "virtually unchallengeable" on habeas

13  review. *See Strickland*, 466 U.S. at 690.  Thus, the state court's decision rejecting petitioner's

14  ineffective assistance of appellate counsel claim is not contrary to or an unreasonable application

15  of clearly established Supreme Court law.

16                    b.   Brady violation

17       On November 21, 2008, defense counsel filed a motion for sanctions for an untimely

18  *Brady* disclosure.  (Resp. Ex. A, CT 539-571 ("*Brady* motion").)  In the motion, counsel

19  describes the chronology of events leading up to the motion.  On November 19, 2007, petitioner

20  was arrested and interviewed by the prosecution's investigator, Investigator Norum.  (*Brady*

21  motion at 3.)  During the interview, petitioner stated that Jane Doe had embezzled approximately

22  $700,000 from her employer, the Catholic Diocese of San Jose.  (*Id.*)  Petitioner claimed that he

23  had an audiotape confirming Jane Doe's crime, and alleged that Jane Doe was now "coming

24  after him."  (*Id.*)  On June 30, 2008, Investigator Norum interviewed Jane Doe, and documented

25  the substance of the interview as Supplemental Reports #22 and #22-A.  (*Id.* at 4.)  In

26  Supplemental Report #22-A, Investigator Norum informed Jane Doe that petitioner accused her

27  of embezzling $700,000 from the Catholic Diocese.  (*Id.*, Ex. A. at 3.)  Jane Doe did not confirm

28  or deny the accusation, but laughed at the amount suggested.  (*Id.*, Ex. A at 3.)  Later on, Jane

1   Doe tacitly conceded to stealing from the Catholic Diocese, and admitted that petitioner did not

2   specifically direct her to embezzle the money, but stated that she felt pressure from him to obtain

3   money in some way. (*Id.*, Ex. A at 4.)

4        On September 10, 2008, counsel entered a general appearance on behalf of petitioner to

5   represent petitioner at trial. (*Id.* at 5.)  Trial was set for November 10, 2008. (*Id.*)  On

6   September 11, 2008, counsel requested informal discovery from the prosecution. (*Id.*)  On

7   September 18, 2008, the prosecution produced Investigator Norum's reports, identified as

8   Supplemental Reports # 18-24. (*Id.*)  Supplemental Report #22-A was not included in the

9   discovery production. (*Id.*)  On October 2, 2008, counsel requested additional discovery,

10  specifically asking for "all records by law enforcement agencies that have investigated the

11  allegations of embezzlement or other conduct involving moral turpitude by Jane Doe." (*Id.*)  On

12  at least four more dates, the prosecution produced discovery materials, including more of

13  Investigator Norum's Supplemental Reports, but none of the produced discovery included

14  Supplemental Report #22-A. (*Id.* at 5-6.)  On November 5, 2008, the trial court granted defense

15  counsel's motion for a trial continuance and continued the trial from November 10, 2008 to

16  December 1, 2008. (*Id.* at 6.)  Finally, on November 13, 2008, the prosecution produced

17  Supplemental Report #22-A without explanation as to its delay. (*Id.*)  On November 21, 2008,

18  counsel filed a *Brady* motion, requesting that the trial court sanction the prosecution for a *Brady*

19  violation by excluding the testimony of Jane Doe. (*Id.* at 17.)

20       On December 1, 2008, the trial court held a hearing on defense counsel's *Brady* motion.

21  (Resp. Ex. B, Vol. 5.)  The court concluded that the Supplemental Report #22-A contained

22  *Brady* material that should have been produced in response to defense counsel's first discovery

23  request in September 2008. (Resp. Ex. B, RT 1310.)  The court also found that the failure to

24  produce the report was inadvertent. (*Id.*)  The court considered and rejected defense counsel's

25  request to exclude Jane Doe's testimony, opting instead to remedy the violation by granting a

26  continuance to allow defense counsel to investigate the matter further. (*Id.* at 1310-12.)

27       In the federal petition, petitioner claims that appellate counsel should have raised the

28  *Brady* violation and argued that the trial court should have granted petitioner's request to impose

1  the sanction of prohibiting Jane Doe's testimony at trial.  This would have prevented the trial

2  from going forward.

3       In California, a court may "make any order necessary to enforce" discovery provisions.

4  Cal. Penal Code § 1054.5(b).  Such orders include "immediate disclosure, contempt proceedings,

5  delaying or prohibiting the testimony of a witness or the presentation of real evidence,

6  continuance of the matter, or any other lawful order."  *Id.*  However, the court may prohibit the

7  testimony of a witness only if all other sanctions have been exhausted.  Cal. Penal Code

8  § 1054.5(c).

9       Here, appellate counsel's decision not to raise this claim on appeal was not objectively

10  unreasonable.  In light of California law, the likelihood that petitioner would have succeeded on

11  this claim on appeal was minimal because the court had not exhausted the other remedies

12  available.  *See id.*  Moreover, trial courts have broad discretion in determining the appropriate

13  sanction for discovery abuse.  *See People v. Jenkins*, 22 Cal. 4th 900, 951 (2000).  Appellate

14  counsel could reasonably have believed that this claim was weaker than other appealable claims.

15  This weeding out of weaker claims is one of the hallmarks of effective appellate advocacy.  *See*

16  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Thus, petitioner has not demonstrated

17  that appellate counsel's failure to raise this claim was deficient, nor that petitioner was

18  prejudiced as a result.

19             c.   Use of the word "victim"

20       Petitioner claims that appellate counsel should have raised the claim that referring to Jane

21  Doe as "Jane Doe" or "victim" violated petitioner's right to an impartial jury.  First, petitioner

22  fails to point to any instances in the record in which either party or the court referred to Jane Doe

23  as the "victim."  Moreover, petitioner has failed to demonstrate that appellate counsel's failure to

24  raise this claim was objectively unreasonable because the use of the term "victim" at trial "is

25  almost exclusively a matter of tactics or strategy," *see People v. Sanchez*, 208 Cal. App. 3d 721,

26  739 (1989).  *See Hensley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995) (recognizing that reasonable

27  tactical decisions, regardless of outcome, do not constitute a failure to meet the adequate

28  performance prong); *Miller*, 882 F.2d at 1434 (noting that effective appellate advocacy includes

1    making decisions to forego raising issues that have little to no likelihood of success).

2    Furthermore, petitioner fails to show how he was prejudiced by appellate counsel's failure to

3    raise this claim.

4            Accordingly, the state court's rejection of this claim was not contrary to or an

5    unreasonable application of clearly established Supreme Court law.

6                        d.    Jane Doe's contact with juror

7            Petitioner alleges that he asked appellate counsel to investigate the issue of Jane Doe and

8    a prosecution witness contacting a juror during deliberation.  Petitioner states that Jane Doe and

9    the witness spoke with Juror Number 10, who ultimately was discharged for good cause

10   unrelated to the alleged contact with Jane Doe and a prosecution witness.  However, petitioner's

11   claims are based purely on speculation.  The trial court record demonstrates that defense counsel

12   brought the issue up stating that petitioner believed he saw Jane Doe with a prosecution witness

13   and that Jane Doe and the witness were speaking with a juror during a break.  (Resp. Ex. B, RT

14   6921-23.)  The prosecution's investigator, Investigator Norum, explained to the court that he was

15   with Jane Doe and this witness at that time, and that Jane Doe and the witness were out of his

16   line of sight for less than one minute.  (*Id.* at 6922.)  Investigator Norum could see the entire area

17   in which petitioner alleges petitioner saw Jane Doe and this witness speaking with a juror, and

18   Investigator Norum did not see any jurors around.  (*Id.* at 6922.)  The trial court asked

19   Investigator Norum to follow up with Jane Doe and the witness and to let the court know

20   whether any additional follow up needed to occur.  The record does not include any other

21   discussion of this issue.  Without any further information, petitioner cannot demonstrate that

22   appellate counsel was ineffective, or specifically, that petitioner was prejudiced by appellate

23   counsel's failure to investigate or raise this issue on direct appeal.

24                        e.    Admission of prior bad acts

25           Petitioner claims that appellate counsel should have raised the issue of the prosecution's

26   motion to admit evidence of two prior uncharged bad acts of domestic abuse.  In California,

27   evidence of prior criminal conduct is generally inadmissible to show that the defendant has a

28   propensity or disposition to commit those acts.  *See* Cal. Evid. Code § 1101(a).  However, the

1  Legislature created exceptions to the general rule where the uncharged acts involve sexual

2  offenses or domestic violence.  *See* Cal. Evid. Code §§ 1108, 1109.  By its express language,

3  Evidence Code section 1108 requires the court to engage in the weighing process under

4  Evidence Code section 352 before admitting propensity evidence.  *See* Cal. Evid. Code §

5  1108(a).  A challenge to the admission of prior bad acts is reviewed for abuse of discretion and

6  will only be reversed if the trial court's ruling was arbitrary, whimsical or capricious.

7       Here, petitioner fails to demonstrate either deficient performance or prejudice.  The

8  evidence sought to be admitted were two instances of domestic violence against two different

9  women to support the theory that petitioner had a propensity for violence, and also possessed the

10  requisite intent and motive.  The admission of these prior bad acts was consistent with California

11  law.  It was not objectively unreasonable for appellate counsel to decide that this claim would be

12  weaker than the claims he opted to raise on appeal.  Nonetheless, even assuming appellate

13  counsel rendered deficient performance, petitioner provides no argument to demonstrate how he

14  was prejudiced by appellate counsel's failure to raise this claim on appeal.

15                    f.    Chain of evidence

16       Petitioner claims that appellate counsel should have raised a "chain of evidence" issue.

17  Specifically, Jane Doe had previously stated that she had been beaten with a belt and a flashlight.

18  The flashlight was a normal 2-cell model.  At the time of trial, however, the flashlight that was

19  introduced into evidence was a 4-5 cell flashlight.  At closing argument, trial counsel raised the

20  issue for the jury that the belt about which Jane Doe initially spoke did not appear to physically

21  match the description of the belt admitted into evidence.  (Resp. Ex. B, RT 5821.)  Though

22  petitioner specifically appears to challenge the authenticity of the flashlight introduced into

23  evidence, petitioner does not cite to the record or give any other indication as to why or how

24  appellate counsel's decision not to raise this issue on appeal was objectively unreasonable or

25  prejudicial.

26       Accordingly, the state court's rejection of petitioner's claim that appellate counsel

27  rendered ineffective assistance was not contrary to, or an unreasonable application of, *Strickland*.

28

3.    <u>Discharge of "holdout" juror</u>

Petitioner alleges that his right to an impartial jury trial and right to due process was violated when the trial court dismissed Juror Number 10 – the lone holdout juror – after more than three days of deliberations.

At the start of voir dire on February 9, 2009, the court informed the prospective jurors that petitioner was charged with serious acts of domestic violence spanning over a period of years involving Jane Doe.  (Resp. Ex. E at 4.)  The court gave each prospective juror a questionnaire, and explained to the jurors that if any of them felt that the subject matter of the case was such that he or she could not be a fair and impartial juror, he or she should check the "yes" answer and explain his or her reasons in the space provided.  (*Id.* at 5.)  The court also explained, "[T]he charges in this case include mayhem, . . .  The charges include torture, they include various acts of domestic violence, and they're serious charges.  [¶] Now, if one were to come to court with the attitude – let's say this is a murder case, which it isn't, but let's say it is and you come to court with the attitude that I have very strong feelings about murder, I don't like the idea of somebody taking somebody's else's life, and once I find out that the charge is murder and somebody is charged with it, that's about all I need to know, and my vote is pretty much going to be guilty right from the start because of the nature of the charges.  [¶] Somebody else might come into criminal court with a completely different attitude.  That attitude may be, I am very sympathetic, I feel a very deep sympathy for someone charged with a serious criminal offense; boy, I'd hate to be there and in that situation myself, and in addition to that, I don't care much for the police, and my vote is pretty much made up once I find out this is a criminal case, I'm voting not guilty.  [¶] Neither of those people can be a fair and impartial juror."  (*Id.* at 4-5.)  Juror Number 10 checked the box indicating "no," she had no problem being a juror in this case.  (*Id.* at 5.)

On February 10, 2009, the court asked all remaining prospective jurors, "So, I wanted to ask all of you, this is a criminal case where someone is charged with committing acts of violence in the domestic setting.  I need to know whether any of you – I'll give you a couple of categories here:  Whether any of you personally or anyone close to you has ever been arrested for or

1   charged with a crime of violence of any kind.  Anybody have that sort of experience where either

2   you've been arrested for a crime of violence or you know somebody well, a close friend or

3   relative who has been?"  One prospective juror who said that she witnessed domestic violence

4   within her family10 years before was excused.  (*Id.* at 6.)

5         After other prospective jurors were excused, Juror Number 10 was asked, "Do you

6   understand the questions asked and answers given so far?"  She answered yes.  The court asked,

7   "Any problems raised for you so far?"  Juror Number 10 responded no.  The court asked, "Do

8   you agree to follow the law as I instruct you?"  Juror Number 10 answered yes.  The court asked,

9   "And the subject matter of the case, you don't have any particular connection with."  Juror

10   Number 10 shook her head from side to side.  (*Id.*)  Juror Number 10 was sworn in as a member

11   of the jury panel.  (*Id.*)  On March 2, 2009, jury deliberations began.

12         On March 3, 2009, after several jury questions, Juror Numbers 6 and 10 submitted notes

13   to the court asking to be excused from deliberations.  (*Id.* at 7.)  The court spoke with Juror

14   Number 10 outside the presence of the other jurors, and Juror Number 10 explained that she felt

15   that because of the decisions she was making, the other jurors believed Juror Number 10 did not

16   understand what she was doing.  (*Id.*)  Juror Number 10 further stated that the other jurors are

17   asking her how they could change her mind.  (*Id.*)  In the end, Juror Number 10 stated that she

18   was listening to the other jurors and that she was able to consider the evidence and the law.  (*Id.*)

19         Juror Number 6 spoke with the court outside of the presence of the other jurors and

20   complained that the process was taking too long, and that if Juror Number 10 was excused, the

21   deliberation process would have to start all over again.  (*Id.* at 8.)  Juror Number 6 went on to

22   say that there was a dissenting voice and everyone seems to be pressuring that juror, while Juror

23   Number 6 felt that it was turning into a forced consensus.  (*Id.*)  However, Juror Number 6 stated

24   that he had been participating in deliberations, and it did not appear as if the jury was at a

25   permanent standstill, and thus, he returned to the jury room for deliberations.  (*Id.*)

26         Forty-five minutes later, the jury foreperson asked to speak to the court.  (*Id.*)  The

27   foreperson notified that court that he was speaking on behalf of the other jurors and wanted to let

28   the court know that there was one juror who was not understanding the deliberation process and

1    she was adding things to the evidence that were not introduced at trial.  (*Id.* at 8-10.)  The court

2    asked if this lone juror was Juror Number 10, and the foreperson confirmed that it was.  (*Id.* at

3    9.)  After discussing the matter with counsel, the court gave the jury an additional instruction

4    reminding the jurors what their goal as jurors was and suggesting alternative approaches to

5    deliberations.  (*Id.* at 10 and n.2.)

6           After an additional two days, and after the jury had submitted seven more jury notes,

7    Juror Number 10 submitted a second request to be removed from the jury, and other jurors had

8    submitted notes complaining about Juror Number 10.  (*Id.* at 11.)  More importantly, however,

9    the prosecutor had filed a memorandum stating that, "Juror No. 10 has been a victim of domestic

10   violence and failed to disclose such in jury voir dire, and that several jurors had submitted notes

11   indicating their belief that Juror No. 10 is not following the instructions, is unable to deliberate

12   properly and has multiple times detailed her personal experience in a domestic violence

13   relationship and the effects on her personally.  Correctional officers had recognized the juror, so

14   a district attorney investigator did a computer search and found that the juror had a criminal

15   record from 1998, and that she had once been a witness to and twice a victim of domestic

16   violence."  (*Id.* at 11-12.)

17          The trial court held a hearing in which Juror Number 10 was called to the courtroom.

18   (*Id.*)  Juror Number 10 stated she felt as though she was being pressured to change her opinion

19   on the verdict, but denied that she had any personal experiences outside of court or with

20   domestic violence that would have any effect on the way she was dealing with this case.  (*Id.*)

21   Juror Number 10 was asked about two prior records of domestic violence claims that she

22   reported to the police, and she denied both of them.  (*Id.* at 13-15.)  Juror Number 10 was also

23   asked about being a witness to a domestic violence incident involving her friend where the

24   police record indicated that Juror Number 10 helped get her friend away from the friend's

25   boyfriend.  (*Id.* at 15.)  However, Juror Number 10 denied that incident as well.  (*Id.*)  Finally,

26   Juror Number 10 was asked about being convicted of providing false information to a police

27   officer in 1993.  (*Id.*)  She was shown her booking photograph, but stated that she did not believe

28   she had a conviction.  (*Id.* at 16.)  Juror Number 10 stated that she did not feel that she was a

1  victim of domestic violence.  (*Id.* at 16-17.)

2        Ultimately, the trial court ruled to discharge Juror Number 10.  It stated, "[N]ot only does

3  it appear to the Court that Juror No. 10 concealed material information during voir dire, thereby

4  depriving both sides of the ability to evaluate her and certainly to question her further on these

5  material issues, . . . the main thrust of the all-day questioning session was whether or not people

6  had a bias or other reason why they could not be a fair and impartial juror.  [¶] We had culled out

7  for the most part the first day people who had hardship problems, and most of the people who

8  had problems with the subject matter of the trial.  When we began voir dire in earnest the second

9  day of jury selection, most of the questioning surrounded the issue of the nature of the case,

10  whether people had any personal experiences that might affect their ability to be fair and

11  impartial, and Juror No. 10 told us nothing about her obvious domestic violence experience

12  where she was personally assaulted twice by her live-in boyfriend to the point where the police

13  came out and she made statements to them describing the violence that was perpetrated upon her.

14  [¶] Then today at [the] hearing, she denied again having any domestic violence experience, and

15  even when shown the reports describing her accounts of domestic violence being perpetrated

16  upon her, she refused to accept that, and denied it, and said that – implied the police must have

17  made it up.  [¶] Then there's also the question of she [sic] having been convicted of an offense of

18  – involving her personal honesty involving a police officer.  That topic was also broached to the

19  jury panel many times.  People were encouraged to be honest with the Court and to bring that

20  information forward if it existed.  She didn't mention that conviction.  She denied it again today,

21  and when asked about it, and then denied it after having been shown her own mug shot which

22  was connected to the documents showing that she does have a conviction for making a false

23  report to the police.  [¶] Had the parties known this material, I can't imagine that she would have

24  remained on the jury panel.  [¶] And it does appear to me that she has violated her oath as a

25  juror, she has committed juror misconduct by concealing material information that bears directly

26  upon her attitudes about domestic violence and her attitudes towards police and that a strong

27  presumption has been raised that her conduct has compromised her impartiality, and I see

28  nothing in the record that would rebut that presumption."  (*Id.* 18-19.)  The trial court concluded

1    that the proper remedy would be to remove Juror Number 10 and substitute an alternate juror.

2    (*Id.* at 19-20.)

3         California's statute for discharge and substitution of jurors has been upheld as facially

4    constitutional.  *See Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir.), *amended*,

5    768 F.2d 1090 (9th Cir. 1985).[11]  However, this does not preclude a Sixth Amendment attack on

6    a particular juror substitution on grounds there was not good cause for it.  *See Perez v. Marshall*,

7    119 F.3d 1422, 1426 (9th Cir. 1997).  The Ninth Circuit has "confirmed that California Penal

8    Code § 1089 is not deficient in terms of protecting a defendant's Sixth Amendment right to an

9    impartial jury, even when § 1089 is invoked to remove holdout jurors who represent the lone

10   vote for acquittal."  *Bell v. Uribe*, 748 F.3d 857, 868 (9th Cir. 2014).

11        The California Court of Appeal denied petitioner's claim.  The state appellate court cited

12   to cases discussing the propriety of Section 1089, and reaffirmed that the trial court has broad

13   discretion to investigate and remove a juror if it finds that the juror is no longer qualified to

14   serve.  The state appellate court reasoned:

15            In this case, the trial court found that Juror No. 10 concealed material
             information during voir dire that bore directly on her attitudes toward domestic
16           violence and the police.  The court further found that Juror No. 10's conduct
             compromised her impartiality, violated her oath as a juror, and constituted
17           misconduct.  We agree with the trial court that the record discloses
             misrepresentations and/or concealment of material information implying bias on
18           the part of Juror No. 10 as a "demonstrable reality," even though the juror
             denied bias.
19
             The record discloses that the jury was already having difficulties in its
20           deliberations relating to Juror No. 10, when an investigator for the prosecutor's
             office learned that Juror No. 10 was familiar to other law enforcement
21

22   _____

     [11]The statute reads, in relevant part:
23
             If at any time, whether before or after the final submission of the
24           case to the jury, a juror dies or becomes ill, or upon other good
             cause shown to the court is found to be unable to perform his duty,
25           or if a juror requests a discharge and good cause appears therefor,
             the court may order him to be discharged and draw the name of an
26           alternate, who shall then take his place in the jury box, and be
             subject to the same rules and regulations as though he had been
27           selected as one of the original jurors.

28   Cal. Penal Code § 1089.

personnel.  The investigator searched law enforcement records and learned of the juror's criminal conviction and her three contacts with law enforcement personnel regarding her experiences with domestic violence.  None of the information the investigator found had been revealed by Juror No. 10 during voir dire.

The information concealed by Juror No. 10 was material.  This was a case involving multiple counts of domestic violence, and Juror No. 10 concealed on voir dire her history of involvement with domestic violence.  The police records attached to the prosecutor's memorandum indicated that Juror No. 10 twice reported being the victim of domestic violence by her live-in boyfriend, and she acknowledged to another officer that she witnessed an incident of domestic violence on her girlfriend.  When asked about and shown the police reports during the hearing, Juror No. 10 denied the incidents occurred as reported, and denied that she was ever a victim of domestic violence.  In addition, the juror denied having a conviction for violating Vehicle Code section 31, relating to giving false information to a peace officer, a misdemeanor.  The conduct underlying such a misdemeanor bears on the juror's veracity, or willingness to lie.  All of this information was relevant and material information bearing directly on the juror's attitudes toward domestic violence and the police, and it is reasonably probable that one or both of the parties would have wanted to have the juror excused from the jury had she revealed the information during voir dire.  In addition, other jurors reported that Juror No. 10 was not following the court's instructions regarding the jury's deliberation duties.  On this record, we find that the trial court did not abuse its discretion in finding good cause to discharge Juror No. 10 and in seating an alternate in her place.

"'The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, "'does not offend constitutional proscriptions.'"  Because we have concluded that the trial court did not abuse its discretion in discharging Juror No. 10, the discharge of the juror did not violate defendant's constitutional rights.

(Resp. Ex. E at 24-25.)

Here, as in *Bell*, petitioner has failed to identify any controlling Supreme Court precedent that contradicts the California Court of Appeal's opinion that Juror Number 10's removal neither violated California Penal Code § 1089, nor the Sixth Amendment.  In addition, the record does not support the idea that the court removed Juror Number 10 because she was a holdout juror.  Rather, the record shows that the court entertained requests from several jurors asking for the removal of Juror Number 10 – including Juror Number 10 herself – and, rather than electing to remove Juror Number 10 immediately, the court did so only after it was discovered that Juror Number 10 lied in voir dire, and concealed material information.  Petitioner has not shown that the California state court's decision to remove Juror Number 10 was contrary to, or an unreasonable application of, clearly established Supreme Court law.

1    To the extent petitioner claims that the prosecutor committed misconduct by requesting

2    discharge of Juror Number 10, this claim is also without merit.  A defendant's due process rights

3    are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v.*

4    *Wainwright*, 477 U.S. 168, 181 (1986).  Petitioner cites to no United States Supreme Court

5    authority to support his allegation that the prosecutor's motion to discharge Juror Number 10

6    equates to prosecutorial misconduct depriving petitioner of a fair trial.

7    　　　　4.   Cumulative effect of errors

8    　　　　In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

9    the cumulative effect of several errors may still prejudice a defendant so much that his

10   conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003)

11   (reversing conviction where multiple constitutional errors hindered defendant's efforts to

12   challenge every important element of proof offered by prosecution).  However, where as here,

13   there is no single constitutional error existing, nothing can accumulate to the level of a

14   constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

15   　　　　　　　　　　　　　　**CONCLUSION**

16   　　　　Petitioner's petition for writ of habeas corpus is DENIED.  The Clerk shall terminate all

17   pending motions and close the file.

18   　　　　The federal rules governing habeas cases brought by state prisoners require a district

19   court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

20   ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has

21   not shown "that jurists of reason would find it debatable whether the petition states a valid claim

22   of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

23   Accordingly, a COA is DENIED.

24   　　　　The Clerk shall close the file.

25   　　　　IT IS SO ORDERED.

26   DATED:  __3/2/15_____

　　　　　　　　　　　　　　　　　　　LUCY H. KOH
27   　　　　　　　　　　　　　　　　　　　United States District Judge

28